IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

```
ZAHRA MOWAFY,                          :
                                       :
                   Plaintiff,          :
                                       :
          v.                           :    C.A. No. 05-733-JJF
                                       :
NORAMCO OF DELAWARE, INC.,             :
and NORAMCO, INC.,                     :
                                       :
                   Defendants.         :
```

William T. Wilson, Esquire of MACELREE HARVEY LTD, West Chester,
Pennsylvania.
Stephen J. Neuberger, Esquire of THE NEUBERGER FIRM, Wilmington,
Delaware.

Attorneys for Plaintiff Zahra Mowafy.

Larry L. Turner, Esquire and Alison L. Tomasco, Esquire of
MORGAN, LEWIS & BOCKIUS LLP, Philadelphia, Pennsylvania.
David E. Brand, Esquire of PRICKETT JONES & ELLIOTT, PA,
Wilmington, Delaware.

Attorneys for Defendants Noramco of Delaware, Inc. and
Noramco, Inc..

**MEMORANDUM OPINION**

June  2009
Wilmington, Delaware

Farnan, District Judge

Pending before the Court is Defendant's Motion For Summary Judgement (D.I. 50). For the reasons discussed, the Court will grant the Motion.

## I. BACKGROUND

Plaintiff, Zahra Mowafy ("Mowafy"), is a fifty-seven year old Muslim woman. Defendants Noramco of Delaware, Inc. and Noramco, Inc. (collectively, "Noramco") are operating companies within the Johnson & Johnson Family of Companies that produce a variety of active ingredients in pharmaceutical compounds. (D.I. 52, Exh. A ¶ 6.) The relevant chronology of events is set forth below.

In May 2001, Mowafy applied for a position as a Senior Process Chemist with Noramco. (Id. ¶ 10.) Six Noramco employees interviewed her; three of the interviewers completed candidate evaluation forms and all three of them agreed that Noramco should pursue Mowafy's candidacy further. (Id. at Exh. 1.) Two of the employees that filled out evaluation forms, Drs. Yong Zhang and Phil Cox, would later become Mowafy's supervisors and, as set forth below, are implicated in Mowafy's discrimination allegations.

Noramco subsequently offered Mowafy the position, and she began work in September 2001. (Id. ¶ 14.) At Noramco, Mowafy

2

reported directly to Dr. Zhang, who, in turn, reported to Dr. Cox. (Id. ¶ 5.) The chemistry group at Noramco also included four student interns ("co-ops") from Drexel University: Dan Markowitz, Lauren Franchetti, Jim Petner, and a fourth individual who remains unidentified in the briefing. Markowitz, Franchetti, and Petner figure heavily in Plaintiff's allegations of discrimination.

Indeed, Mowafy alleges a number of incidents involving the co-ops during her first few months of work. Mowafy alleges that during her first month of work, Markowitz and Franchetti repeatedly asked her about "Islam, its tenets, and why Muslims produce so many terrorists." (D.I. 54 at A-1, A-24) During her second month of work, Franchetti is further alleged to have screamed in fright upon observing Mowafy conducting her daily prayers in a bathroom, where Mowafy prayed for its privacy. (Id. at A-1.) Finally, Franchetti is, "[o]n some occasions," alleged to have failed to inform Mowafy of lunch meetings with Dr. Cox, causing Plaintiff to arrive late to the lunch meetings. (Id.)

Shortly thereafter, during December of 2001, Markowitz and Petner are alleged to have "jerked a chair," which caused Mowafy's briefcase to fall, strewing her papers about the floor. (Id. at A-2.) In January 2001, the same two are further alleged to have urged Mowafy to open a file on her computer that resulted in the spread of virus, an act that they allegedly ridiculed and made fun of afterwards. (Id.) Also during this approximate time

frame, Mowafy alleges that Markowitz made comments regarding Mowafy's age. Specifically, Mowafy alleges that Markowitz responded to Mowafy's requests for assistance with the comment "you can't teach an old dog new tricks," and remarked that Mowafy's chapped hands were "an age related problem." (Id.)

In January 2002, Mowafy received her first 90-day performance evaluation. Overall, she was rated as demonstrating "Effective Performance," which is the middle category in Noramco's five tier ranking system that included categories ranging from "Unsatisfactory Performance" to "Outstanding Performance." Mowafy was given "Below Average" rankings in three particular categories pertaining to efficiency, regulatory compliance, and knowledge of industry skills and trends. (D.I. 52, Exh. A at Exh. 3.) On the other hand, she was given "Above Average" rankings in five particular categories pertaining to communication, initiative, and attentiveness. (Id.) For eight particular performance criteria, the reviewer provided no ranking, instead checking a box to indicate that it was too early to provide an evaluation. (Id.)

In March 2002 – only about six months after Plaintiff began work – Drs. Zhang and Cox held a meeting with Mowafy to discuss her performance. The substance of the meeting was detailed in a memorandum prepared the day after the meeting. (D.I. 52, Exh. A at Exh. 4.) The memorandum explained that Drs. Zhang and Cox "felt that [Plaintiff's] performance was not in line with that

4

expected for a Senior Process Chemist." (Id.) Specifically, the memo outlined slow performance toward the completion of a development plan and a high ratio of experiment failures. (Id.) The memorandum further noted a need for "better time management" and greater "focus on problem solving rather than unfocussed data gathering." (Id.)

Mowafy alleges additional misconduct on the part of the co-ops in the time frame surrounding this performance meeting. Specifically, Mowafy complains of an incident when she spilled some alumina powder on her lab coat. This allegedly resulted in Petner accusing Mowafy of stealing narcotics. (D.I. 54 at A-26.) Petner is further alleged to have accused Mowafy of "bossing [him] around" and disconnecting one of his reactions. (D.I. 53 at 3-4.) Beginning in March 2002 and continuing to December 2002, Mowafy alleges that Dr. Zhang allowed the co-ops to arrive late, take long lunches, and leave early. (D.I. 54 at A-3, A-26.) In these circumstances, the co-ops are alleged to have openly bragged that Dr. Zhang would take their side in any dispute between them and Mowafy. (Id. at A-3.)

In July 2002, Dr. Zhang issued a lengthy written warning to Mowafy, explaining that Plaintiff's performance needed to improve. (D.I. 52, Exh. 4 at Exh. 5.) The warning detailed a "history of performance deficiencies," including specific examples of poor planning, slow performance, and failure to follow procedure. (Id.) For instance, the warning noted an

5

instance where Mowafy had agreed to complete a series of four experiments to test a "critical parameter range." According to the warning letter, the results of the first experiment could not be used "because the cooling profile used was not correct." (Id.) Mowafy is then described as refusing to begin the next experiment, agreeing to do so only after a direct instruction from her supervisor. Ultimately, the warning letter explains, only two of the four experiments were completed on time. (Id.) The warning letter concluded by placing Mowafy on six months probation, instructing that any further performance incidents could result in termination. (Id.)

At roughly the same time, Mowafy received her mid-year performance evaluation. At this point, Mowafy was given an overall rating of "Below Average Performance." (D.I. 52, Exh. 4 at Exh. 6.) With regard to particularized performance criteria, Mowafy received no "Above Average" ratings. Mowafy was rated as showing "Unsatisfactory Performance" in three categories, "Below Average Performance" in 16 categories, and "Effective Performance" in seven categories. (Id.) Mowafy reviewed the evaluation, noting in writing that she did not agree with the results. (Id.)

In August 2002, Cox prepared a lengthy and detailed letter summarizing Mowafy's performance. (D.I. 52, Exh. A at Exh. 6.) The letter appears to have been prepared in connection with a weekly meeting that Dr. Cox had instituted with Mowafy to review

6

her progress. (D.I. 52, Exh. A ¶ 22.) The letter noted a number
of specific ongoing performance deficiencies pertaining to
throughput, work quality, priority management, and scientific
judgment. (D.I. 52, Exh. A at Exh. 6.) As just one of numerous
examples, the letter describes a set of six crystallization
experiments that should have resulted in uniform "initial
particle size," but did not. (Id.) Apparently, the experimental
apparatus was improperly left open to the atmosphere, resulting
in unpredictable changes in solvent composition over time. (Id.)
According to the warning letter, though Mowafy agreed that she
was responsible for setting up the apparatus, she complained that
her supervisors had seen the apparatus but had not said anything.
(Id.) At the same time, the letter states that Mowafy would
complain about "the futility of close supervision and that all
she needed was to be told what she had to do." (Id.)

In October 2002, roughly three months after Plaintiff was
placed on probation, Dr. Zhang issued a second lengthy and
detailed warning letter to Mowafy. (D.I. 52, Exh. A at Exh. 8.)
The letter notes that Mowafy had been counseled regularly and had
been reviewed on a weekly basis, but had not improved her
performance. (Id.) The letter states that Mowafy had
demonstrated an "inability to deliver quality output from [her]
lab experiments and perform at the level of **Senior Process
Chemist**." (Id. (emphasis in original).) The letter further

7

included an attachment detailing specific experiments and specific errors pertaining to process, judgment, lack of knowledge, and time management. (See id.) In total, the attachment identified deficiencies with nine different experiments and noted particular dates where other "performance shortfalls" took place, including, for instance, failure to provide temperature control, improper use of pH probe, failure to inspect an eye wash station, taking her lab notebook home without providing notification, and an inability to use basic chemistry software. (Id.) Mowafy again noted in writing that she disagreed with the assessment. (Id.) Plaintiff was placed on "60 days warning" and instructed that any further performance incidents would result in immediate suspension or termination. (Id.)

In January 2003, Mowafy received another performance evaluation, which, like her previous evaluation, shows an overall performance rating of "Below Average." In comments, the evaluation explains that the "nature of [Mowafy's] performance still shortfalls from the expectations and required sustained improvement." (D.I. 52, Exh. A at Exh. 9.) On the same day, Noramco terminated Mowafy's employment, explaining that despite being counseled regularly, Mowafy's performance had not improved and that she had demonstrated an "inability to satisfactorily perform the responsibilities of a Senior Process Chemist." (D.I.

8

52, Exh. A at Exh. 10.)

Concurrent with the ongoing reports of performance deficiencies described above, Mowafy alleges that Dr. Zhang continually "displayed hostility." (D.I. 54 at 4.) In support of this allegation, Mowafy makes the following particularized allegations:

- That during November 2001 Dr. Zhang, along with Petner and Markowitz, pestered Mowafy to reveal computer passwords. (D.I. 54 at A-24.)
- That in November 2001 Dr. Zhang declined to give Mowafy "Green Belt" and "Black Belt" training, even though other full time personnel attended "Green Belt" training. (Id.)
- That in January 2002 on Mowafy's performance review, Dr. Zhang denoted Mowafy's short term goal as becoming a Senior Scientist, even though that was already Mowafy's job title. (Id. at A-25.)
- That in January 2002 Dr. Zhang ridiculed Mowafy's ideas, and then later presented them as his own without attribution. (Id.)
- That in February 2002 Dr. Zhang "smilingly" informed Mowafy that she would get only a 1% raise instead of an expected 4% raise. (Id.)
- That in June 2002 Dr. Zhang characterized Mowafy's work as "blundering" and openly criticized her as a failure. (Id. at A-27 to A-28.)
- That from March to November of 2002 Dr. Zhang forced Mowafy – and not female co-worker Jenny Yu – to transport heavy solvents. (Id. at A-26.)
- That during 2002 Dr. Zhang spit whenever he passed Mowafy's desk or came across her in walkways. (Id.)

Finally, Mowafy points to "Other Workplace Difficulty" that could "not always be identified to a specific manager or co-worker." (Id. at 5.) Such incidents include, for instance, the disappearance of Mowafy's computer diskettes containing her data,

9

the loosening of screws on her experimental apparatuses, the contamination of her solvents, and the disruption of her experiments. (Id. at 6.)

In response to the alleged mistreatment by the co-ops and management, on or about October 27, 2003, Mowafy filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") and the Pennsylvania Human Rights Commission alleging that her termination was based on her age and religion. (D.I. 1, Exh. A.) On July 20, 2005, the EEOC issued a right to sue letter, stating therein that it was "unable to conclude that the information [in Plaintiff's Charge of Discrimination] establishes violations of the statutes." (D.I. 1, Exh. C.) On October 18, 2005, Mowafy filed the instant action alleging discrimination based on (1) religion, race and/or national origin under Title VII of the Civil Rights Act, 42 U.S.C. §2000(e) et seq. and (2) age under the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621 et seq.

## II. LEGAL STANDARD

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, a party is entitled to summary judgment if a court determines from its examination of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," that there are no genuine issues of material fact and that the moving party is entitled to judgment

10

as a matter of law. Fed. R. Civ. P. 56(c). In determining whether there are triable issues of material fact, a court must review all of the evidence and construe all inferences in the light most favorable to the non-moving party. However, a court should not make credibility determinations or weigh the evidence.

To defeat a motion for summary judgment, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts. In the language of the Rule, the non-moving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" However, the mere existence of some evidence in support of the nonmovant will not be sufficient to support a denial of a motion for summary judgment; there must be enough evidence to enable a jury to reasonably find for the nonmovant on that issue. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).

## III. DISCUSSION

By her Complaint, Mowafy alleges that Noramco's termination of her employment was a pretext for unlawful discrimination because of her age, religion, and race/national origin. Alleging "open hostility" toward Mowafy and "toleration of harassing behavior by co-workers," Mowafy's Complaint is further understood by the parties as raising a hostile work environment claim. By its Motion, Noramco contends that Mowafy's discrimination claims fail as a matter of law because "she has not adduced any evidence

11

that the legitimate, non-discriminatory reasons for terminating
her employment was a pretext for intentional discrimination."
(D.I. 51 at 1.) With regard to Mowafy's hostile work environment
claim, Noramco contends that it is entitled to summary judgment
because Plaintiff cannot establish that alleged discrimination
was severe and pervasive. (Id.)

Below, the Court considers each of Mowafy's claims in turn.

## A. Whether Noramco Is Entitled To Summary Judgment On Mowafy's Discrimination Claims

When considering discrimination claims under Title VII and
the ADEA, the Court must use the burden-shifting analysis of
McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Brewer v.
Quaker State Oil Refining Corp., 72 F.3d 326, 330 (3d Cir. 1995).
Under this analysis, a plaintiff must first establish a prima
facie case of discrimination. Green, 411 U.S. at 802. The prima
facie requirement for making a Title VII claim "is not onerous"
and poses "a burden easily met." Doe v. C.A.R.S. Prot. Plus, 527
F.3d 358, 365 (3d Cir. 2008) (citing Tex. Dep't of Cmty. Affairs
v. Burdine, 450 U.S. 248, 253 (U.S. 1981)). Once the plaintiff
has established a prima facie case of discrimination, the burden
shifts to the defendant. The defendant must "articulate some
legitimate, nondiscriminatory reason" for its conduct. Green,
411 U.S. at 802. If the defendant produces a sufficient reason

12

for its actions, the burden shifts back to the plaintiff to demonstrate that the reasons articulated by the defendant are merely a pretext for discrimination. Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir. 1994). To defeat a motion for summary judgment, a plaintiff must point to some evidence from which the "factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." Id. To accomplish this, a plaintiff can show a defendant's reasons are so weak, incoherent, implausible, or inconsistent such that they lack credibility. Id. at 765. This standard "places a difficult burden on the plaintiff" because "it arises from an inherent tension between the goal of all discrimination law and our society's commitment to free decision making by the private sector in economic affairs." Id. (citations omitted).

## 1. Mowafy's Age Discrimination Claims

A prima facie case of age discrimination under the ADEA requires the plaintiff to allege four elements: (1) he or she is at least 40 years of age, (2) he or she is qualified for the position in question, (3) he or she has suffered an adverse employment action, and (4) he or she has been replaced by a sufficiently younger employee to permit a reasonable inference of age discrimination. Sempier v. Johnson & Higgins, 45 F.3d 724,

728 (3d Cir. 1995). The fourth element is often stated in more
general terms as a requirement that the "adverse employment
action occurred under circumstances that give rise to an
inference of intentional discrimination." See Jones v. Sch.
Dist. of Phila., 198 F.3d 403, 410-11 (3d Cir. 1999).

Reviewing the evidence presented by the parties in the light
most favorable to Mowafy, the Court concludes that Mowafy has
established a prima facie case of age discrimination. Though the
Court sees no evidence in the record that Mowafy was replaced by
a younger person – and though the issue is close – the Court
nevertheless concludes that Mowafy has met the low burden of
adducing evidence permitting an inference of discrimination.
Specifically, Mowafy was terminated while younger employees were
not and, according to Mowafy's affidavit, prevented from
attending "Green Belt" training with other full time personnel.
(D.I. 54 at A-3.) Mowafy further states in her affidavit that
younger employees, including the co-ops from Drexel University,
were allowed to arrive late, take long lunches, and leave early
without suffering any disciplinary action. (Id.) Finally,
Mowafy points to Markowitz's remarks that "you can't teach an old
dog new tricks" and that Mowafy's chapped hands were "an age
related problem," which, for the purposes of this motion, Noramco
does not deny were said. (Id. at A-2.) The totality of this
evidence – viewed in the light most favorable to Mowafy –

14

suffices to meet the minimal burden necessary to establish a prima facie case of age discrimination.[1]

The burden now shifts to Noramco to establish a legitimate non-discriminatory reason for Mowafy's termination.  In light of the abundant documentation describing Mowafy's performance deficiencies, see supra Part I, the Court finds that Noramco has met this burden.  Indeed, Noramco has produced documentation substantiating a history of poor work performance involving technical incompetence, poor time management, and lack of scientific judgment on the part of Mowafy.  This documentation – which covers a period of more than a year – includes evaluations, warnings, and memoranda and describes in detail particular defects in particular experiments and reveals an effort by Noramco to salvage Mowafy's employment through counseling and close supervision.  Unable to do this, Noramco chose to terminate Mowafy for poor work performance, which the Third Circuit has recognized as a legitimate, non-discriminatory reason satisfying a defendant's burden under Title VII.  See Wooler v. Citizens

---

[1] In concluding that Mowafy has met her burden of establishing a prima facie case, the Court further notes that the Third Circuit has explained that "[p]roof of discharge will establish a prima facie showing in a Title VII suit." Bellissimo v. Westinghouse Elec. Corp., 764 F.2d 175, 180 (3d Cir. 1985).  The Third Circuit further explained that "[w]e have held that a plaintiff alleging a discriminatory layoff need show only that he was laid off from a job for which he was qualified while others not in the protected class were retained." Id.  To the Court's knowledge, this authority, though rarely cited, has not been overruled, and thus guides the Court's analysis here.

Bank, 274 Fed. Appx. 177, 180 (3d Cir. 2008) ("Here, the District
Court properly found that though Wooler established a prima facie
case, there was a legitimate, nondiscriminatory reason for
Wooler's firing – her poor performance."). Thus, to survive
summary judgment, Mowafy must meet the "difficult burden" of
showing that poor work performance was merely a pretext for
unlawful discrimination.

The Court concludes that Mowafy has not met this burden.
Mowafy argues, without citation to the record, that she "presents
extensive evidence that the performance criticisms that were
directed her way were invalid," yet then goes on to admit that
some of these criticisms "likely . . . are valid and, perhaps,
occasionally uncontested." (D.I. 53 at 12.) In the Court's
view, Mowafy's position is little more than a request for the
Court to rule on the strength of cause for her discharge.
However, as the Third Circuit explained, "federal courts are not
arbitral boards ruling on the strength of 'cause' for discharge.
The question is not whether the employer made the best, or even a
sound, business decision; it is whether the real reason is
discrimination." Keller v. Orix Credit Alliance, 130 F.3d 1101,
1109 (3d Cir. 1997) (citations omitted). The Court has reviewed
Mowafy's responses to both her performance reviews and the
written warnings she was issued. (See, e.g., D.I. 54 at A-6 to
A-9.) Having done so, the Court finds nothing suggesting that

16

Noramco's proffered reason for terminating Mowafy's employment, poor work performance, "was so plainly wrong that it cannot have been [Noramco's] real reason." Keller, 130 F.3d at 1109. Though Mowafy's responses reveal that there may have been a number of technical disputes and workplace miscommunications at Noramco, the Court finds nothing that would allow it to conclude that Noramco was "plainly wrong" to terminate Mowafy's employment.

To the extent Mowafy relies on Markowitz's alleged remarks regarding her age to establish pretext, the Court declines to give such comments great weight. Indeed, Markowitz was decidedly not a decisionmaker with influence over employment decisions. He was a student intern. Furthermore, the comments were allegedly made roughly a year before Mowafy's employment was terminated. As the Third Circuit explained, "[s]tray remarks by non-decisionmakers . . . are rarely given great weight, particularly if they were made temporally remote from the date of decision." Ezold v. Wolf, Block, Schorr & Solis-Cohen, 983 F.2d 509, 545 (3d Cir. 1992); see also Pratta v. Am. Gen. Fin. Servs., No. 04-089-JJF, 2006 U.S. Dist. LEXIS 65351, at *12-*13 (D. Del. Sept. 13, 2006) (referring to employees as "old colleagues," "old timers," and "old farts" "may reasonably be considered offensive" but is not in itself "probative of discrimination"). Finally, as to the allegedly preferential treatment of student co-ops with regard to work schedule and lunch breaks, the Court finds that

17

such student employees are poor comparators to a Senior Process Chemist with years of experience.  The Court thus gives this consideration little weight as well.

Accordingly, the Court will grant Defendant's Motion with respect to Mowafy's age discrimination claim.

## 2.   Mowafy's Religious Discrimination Claim

The elements of a prima facie case of discrimination under Title VII parallel those of an age discrimination case under the ADEA.  Specifically, a prima facie case of religious discrimination under Title VII requires the plaintiff to show that (1) she is a member of a protected class; (2) she is qualified for the former position; (3) she suffered an adverse employment action despite being qualified; and (4) the action occurred under circumstances giving rise to an inference of unlawful discrimination, such as when non-members of the protected class are treated more favorably than the plaintiff.  Aljadir v. Substitute Teacher Serv., No. 02-464-GMS, 2004 U.S. Dist. LEXIS 19879, at *7-*8 (D. Del. Oct. 5, 2004).

As above, though the issue is close, the Court concludes that Mowafy has established a prima facie case of religious discrimination under Title VII.  The parties only dispute the fourth element of the prima facie case.  Noramco terminated Mowafy's employment, and it did not terminate the employment of other non-muslim employees, such as the student co-ops, Dr.

Zhang, or Dr. Cox.  Furthermore, Mowafy alleges in her affidavit
the student co-ops questioned her about Islam, suggesting that it
had a propensity for producing terrorists.  (See D.I. 54 at A-1.)
This evidence, though limited, is sufficient to meet the low
burden of establishing a prima facie case of religious
discrimination under Title VII.

Nevertheless, for the reasons set forth above, the Court
will grant Noramco summary judgment on Mowafy's religious
discrimination claim.  Specifically, the Court finds that Noramco
has met its burden of showing a non-discriminatory reason for
Mowafy's termination, and that Mowafy has not adduced evidence
from which a reasonable jury could infer that Noramco's
explanation was merely a pretext for unlawful discrimination.

The conduct at the core of Mowafy's religious discrimination
claim appears to be the co-ops allegedly asking "all sorts of
questions about Islam and Islamic beliefs and why are Muslims
producing terrorists" and Franchetti's alleged "screaming" in
fright upon observing Mowafy conducting her prayers in a
bathroom.  (D.I. 54 at A-24.)  However, these allegations are
rather non-specific and include no mention of explicit slurs or
religious epithets.  Indeed, from the Plaintiff's papers, the
Court is unable to clearly discern the true substance and tone of
the alleged conduct.  Furthermore, evidence of this conduct is
unsupported by any evidence other than Mowafy's affidavit.

19

Nevertheless, on summary judgment, the Court shall construe this minimal evidence in the light most favorable to Mowafy. On doing this, the Court still cannot find that a reasonable jury could conclude that Noramco's explanation for terminating Mowafy was a pretext for discrimination. Indeed, the alleged questioning regarding Islam is alleged to have occurred over the course of just two weeks, and the alleged "screaming" occurred during the course of a one month period. (D.I. 54 at A-24.) The Court acknowledges that these time periods were shortly after the September 11 attacks. However, these time periods were also the initial weeks of Mowafy's employment at Noramco, and were well removed from her termination more than a year later. Furthermore, all alleged misconduct having a tangible religious nexus appears to be isolated to the student co-ops. Mowafy does not allege that any such conduct is attributable to anyone with genuine decisionmaking capacity, such as Drs. Zhang and Cox. In these circumstances, the Court finds that the alleged misconduct by the student co-ops cannot meaningfully serve as evidence of pretext.

### 3. Mowafy's Race/National Origin Discrimination Claim

The elements of a prima facie case of race/national origin discrimination under Title VII are identical to those of a religious discrimination claim under Title VII. See, e.g., Bailey v. Walmart, No. 06-603-JJF, 2008 U.S. Dist. LEXIS 18087, at*6-*7 (D. Del. Mar. 7, 2008).

As above, the Court concludes that Mowafy has established a prima facie case of race/national origin discrimination under Title VII.  Noramco terminated Mowafy's employment, and it did not terminate the employment of others who where were not from Egypt or other parts of the middle east.  Furthermore, given that it is well known that Islam is the predominant faith of the region from which Mowafy originates, the Court further finds that the student co-ops' remarks regarding Islam have some pertinence to the issue of discrimination based on race/national origin. This evidence is sufficient for Mowafy to meet the low burden of establishing a prima facie case of race/national origin discrimination under Title VII.

However, as above, the Court finds that Noramco has met its burden of showing a non-discriminatory reason for Mowafy's termination, and that Mowafy has not adduced evidence from which a reasonable jury could infer that Noramco's explanation was merely a pretext for unlawful discrimination.  See supra Parts II.A.1 and II.A.2.)  The Court will thus grant Noramco summary judgment on Mowafy's race/national origin discrimination claim.

## B.  Whether Noramco Is Entitled To Summary Judgment On Mowafy's Hostile Work Environment Claim

In order to establish a prima facie hostile work environment claim, a plaintiff must show: (1) she suffered intentional discrimination because of her protected activity; (2) the discrimination was severe or pervasive; (3) the discrimination detrimentally affected her; (4) it would have detrimentally

affected a reasonable person in like circumstances; and (5) a basis for employer liability is present. <u>Jensen v. Potter</u>, 435 F.3d 444, 449 (3d Cir. 2006). Noramco contends that it is entitled to summary judgment because, even if one accepts Mowafy's allegations as true, the alleged discrimination was not so "severe or pervasive" as to create a hostile work environment.

Title VII is violated only "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment . . . ." <u>Harris v. Forklift Sys.</u>, 510 U.S. 17, 21 (U.S. 1993) (citations omitted). The Court decides whether this standard is met by "looking at all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." <u>Clark County Sch. Dist. v. Breeden</u>, 532 U.S. 268, 270-71 (U.S. 2001) (citations omitted). "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." <u>Id.</u> at 271 (citations omitted).

On reviewing the record as a whole, the Court concludes that Mowafy has failed to present sufficient evidence from which a jury could conclude that the alleged discriminatory conduct was

so severe or pervasive as to create a hostile work environment.
Mowafy alleges that both the student co-ops and management
committed conduct that created a hostile work environment.  The
Court shall consider the conduct of each of these groups of co-
workers below.

### 1.  Conduct By The Student Co-Ops

The most overtly discriminatory conduct Mowafy alleges is
attributable to student co-ops.  Specifically, with respect to
her religion, Mowafy alleges that Markowitz and Franchetti "kept
asking her about Islam, its tenets, and why Muslims produce so
many terrorists."  (D.I. 53 at 2.)  Mowafy further alleges that
Franchetti "screamed as if she were frightened" upon observing
her conducting prayers in a bathroom.  (Id. at 2-3.)  With regard
to Mowafy's age, Mowafy alleges that Petner remarked "you can't
teach an old dog new tricks" and that Mowafy's chapped hands were
"an age related problem."  (Id. at 3.)  In the Court's view,
these allegations are too vague and indefinite to constitute the
seeds of a discrimination claim under Title VII.  Although it may
have been insensitive for the student interns to question Mowafy
about Islam's tenets and suggest that her faith had a propensity
for producing terrorists, the Court is unable to discern a clear
discriminatory motive or purpose.  This type of questioning,
especially when coming from younger college students, may simply
reflect a lack of understanding regarding Mowafy's religion.  On
the current evidentiary record - which consists entirely of

23

Mowafy's affidavit – the Court cannot make a determination as to whether this is the case. Nevertheless, construing this evidence in the light most favorable to Plaintiff, as the Court is required to do on summary judgment, the Court still cannot find that this conduct meaningfully substantiates a hostile work environment claim. Indeed, this conduct involves no physical threats or religious slurs, and, though Mowafy alleges to have been "put on the defensive," the Court sees no suggestion that the alleged conduct impeded her ability to complete her work. Furthermore, the conduct involves no individuals involved in employment decisions, but only college-aged student interns. The same may be said with regard to Franchetti allegedly screaming in fright upon observing Mowafy in prayer.

Moreover, as explained above, though Mowafy alleges that the co-ops "kept" asking her about Islam and that "during October," Franchetti screamed when observing Plaintiff in prayer, Mowafy fails to allege in any concrete way that this conduct was persistent or on-going. Indeed, it appears to have taken place over the course of only a few weeks that were far removed from the date of her termination. As presented, the conduct appears to be little more than the type of isolated incidents that simply do not support a hostile work environment claim. The same is true of Petner's alleged comments regarding Mowafy's age. Though insensitive, the Court finds that such comments do not appear to rise beyond the level of an "offhand remark."

Mowafy attempts to bolster her claim by pointing to additional conduct by the student co-ops that, though insensitive, lacks an overt discriminatory element. For instance, Mowafy points to the co-ops knocking over her attaché case and failing to inform her of lunch gatherings. (D.I. 53 at 3-4.) Mowafy further alleges that the co-ops tampered with her experimental apparatuses, accused her of taking narcotics from the lab, and urged her to open a computer file that resulted in the spread of a computer virus. (D.I. 53 at 3.) However, as above, the Court again finds these allegations to be unusually unclear and vague. Based on the evidence presented, which consists only of Mowafy's affidavit, the alleged conduct appears more akin to common workplace tribulations. Mowafy presents no evidence suggesting that the alleged conduct was connected to discrimination on the basis of religion, race, or age. Further, as explained above, in the Court's view, the overall weight of any conduct attributable to the co-ops is limited because they are merely entry-level, temporary student employees and not full-time co-workers or managers with meaningful decisionmaking capacity.

Mowafy argues that the Fourth Circuit decision EEOC v. Sunbelt Rentals, Inc., 521 F.3d 306 (4th Cir. 2008), is instructive. (D.I. 53 at 14.) The Court agrees that it is instructive, but only to demonstrate this case does not present a true hostile work environment. In Sunbelt, the Fourth Circuit

overruled the district court's grant of summary judgment in favor of the employer on the plaintiff's hostile work environment claim. The plaintiff in Sunbelt, a Muslim employee alleging religious discrimination, was called a "Taliban" and a "towel head" by the shop foreman of the store where plaintiff worked. Sunbelt, 521 F.3d at 316. Though plaintiff was a veteran of the U.S. Army, another co-worker repeatedly challenged plaintiff's allegiance to the United States, asking plaintiff "are you on our side or are you on the Taliban's side" and telling him if "you don't like America or where we stand, you can just leave." (Id.) Likewise, another co-worker admitting commenting "often" that plaintiff was such things as a "fake ass Muslim want-to-be turbine wearing ass." (Id. at 311.) This same co-worker, attempting to ridicule plaintiff after the September 11 attacks, commented to plaintiff that "if anyone upsets you pretend this stapler is a model airplane [and] just toss it in the air, just repeatedly catch it, [and] don't say anything." (Id.) Muslim customers of plaintiff's employer further testified as having been called such things as a "Bin Laden," "Hezbullah," "Ayatollah," "Kadaffi," "Saddam Hussein," "terrorist," and "sun nigger," providing yet additional evidence of a hostile work environment. (Id. at 317.) This is only a sampling of the conduct present in Sunbelt, and there is no evidence that the alleged conduct by the student co-ops in this case is remotely this severe.

Similar to the Plaintiff in this case, the plaintiff in Sunbelt pointed to additional conduct that lacked a "direct religious nexus," including the defacement of his business cards with the term "dumb ass" and the hiding of his timecard on congregational prayer days. (Id. at 317-18.) In light of the explicit religious harassment, the Sunbelt Court found that a reasonable jury could infer that this conduct was motivated by disdain for plaintiff's faith. However, in this case, the alleged overtly discriminatory conduct by the co-ops is far more limited, and Mowafy alleges nothing so severe as defacing her business cards with derogatory terms like "dumb ass." Thus, in the Court's view, this case is not like Sunbelt.

Rather, this case is comparable to the Third Circuit case Sherrod v. Phila. Gas Works, 57 Fed. Appx. 68, 69 (3d Cir. 2003). In Sherrod, the Third Circuit upheld the district court's grant of summary judgment in favor of the employer on plaintiff's hostile workplace environment claim. The plaintiff in Sherrod, an African-American woman claiming racial discrimination, alleged that her supervisor stated that "he didn't like the way [two African-American clerks that plaintiff supervised] were eating at their desks, it must be their culture." Sherrod, 57 Fed. Appx. at 70. Similarly, the plaintiff alleged that another supervisor stated that if "[the two clerks] don't do their work, I'm going to sit at their desks with a whip." (Id.) The plaintiff further complained that a supervisor told a clerk "don't do nothing

[plaintiff] tells you to do," and that, in general, she was screamed at and treated badly. (Id. at 76.) Explaining that the supervisor's remarks were subject to a racially neutral interpretation and were not physically threatening or humiliating, the Third Circuit concluded that the comments, by themselves, did not create a hostile work environment, even if they were assumed to be racially motivated. (Id. at 76-77.) When considered in combination with the additional alleged mistreatment, the Third Circuit held that the totality of the conduct still did not create a hostile work environment. As the Third Circuit explained, though the mistreatment may have affected plaintiff's mental health, there was no evidence that they unreasonably interfered with her work performance. (Id.)

Similar to Sherrod, and as explained above, the Court is unable to discern a clear discriminatory motive behind the co-ops' alleged inquiries about Islam. The same is true of Petner's remarks regarding Plaintiff's chapped hands. Further, though it may have been inconsiderate for Petner to have remarked that "you can't teach an old dog new tricks," a reasonable jury could not infer from this that ageism was pervasive or regular. Although in Sherrod, unlike the instant case, the alleged discriminatory remarks were directed not at the plaintiff but at her co-workers, the remarks in Sherrod came from a supervisor whereas in the instant dispute they came from student co-ops. Thus, in the Court's view, the overall severity of the alleged discriminatory

28

conduct in Sherrod is comparable to the conduct in the instant dispute. With regard to surrounding non-discriminatory mistreatment, like Sherrod, the Court sees no allegation that the co-ops' treatment unreasonably interfered with Plaintiff's work performance. The Court detects, at most, complaints of "embarrassment" when the co-ops allegedly made accusations regarding computer viruses and failed to inform Mowafy of lunch gatherings. (D.I. 53 at 3-4.)

Accordingly, following Sherrod, the Court concludes that the complained of mistreatment by the student co-ops is insufficient to establish a hostile work environment.

## 2. Conduct By Management

The Court finds no evidence that the alleged conduct of management, in particular Dr. Zhang, reflects discrimination on the basis of religion, race/national origin, or age, as required to support a hostile work environment claim.

Notably, none of the alleged conduct by Dr. Zhang carries an overtly discriminatory tone. To the extent Mowafy complains of simply not being treated as well as co-workers who are outside the protected class, the Court finds that no reasonable jury could conclude that Mowafy has presented evidence sufficient to establish a hostile work environment. For instance, Mowafy alleges that Dr. Zhang allowed the student co-ops the privileges of arriving late, taking long lunches, and leaving early. (D.I. 53 at 4.) However, in the Court's view, it is not surprising

29

that Mowafy, a Senior Process Chemist, would be allowed less leeway in these areas than student interns. It is certainly not evidence of an actionable hostile work environment. Mowafy further alleges that Jenny Yu, a younger co-worker, was not required to transport heavy solvents like Plaintiff was. (See D.I. 54 at A-26.) But Mowafy has put forth no evidence that this or any other conduct by Zhang was motivated by ageism or a disdain for Islam.

The most offensive conduct Mowafy alleges is that Dr. Zhang would spit when he passed her desk or walked by her in hallways. However, similar to the alleged conduct by the co-ops, Mowafy's allegations of spitting are vague and inconclusive. Indeed, the sum total of the evidence regarding Zhang's alleged spitting consists of less than two lines of text in her affidavit (D.I. 54 at A-4), less than two lines of text in a supplement to an EEOC harassment questionaire (Id. at A-25), and some deposition testimony elicited by the Defendants (D.I. 52, Exh. B at A-61 to A-62). This evidence, though scant, is beset by inconsistencies. Specifically, Mowafy alleges in briefing that the spitting happened "frequently," and stated in the supplement to an EEOC harassment questionnaire that this happened "whenever he comes across me on walkways and when he passes by my office/desk area." (D.I. 53 at 5; D.I. 54 at A-25.) However, during deposition, Mowafy testified that the spitting "wasn't every single day" and that it "wasn't very frequent." (D.I. 52, Exh. B at A-61 to A-

62.) Mowafy further testified that the spitting may have been "a matter of what mood he is in, the circumstances." (Id.) In these circumstances, the Court is unable to conclude that Zhang's alleged spitting – which lacks a clear discriminatory motive and appears to have occurred with indeterminate frequency – meaningfully contributes to proving a hostile work environment under Title VII.

All of the alleged misconduct by management must be further viewed through the lens of the ongoing performance issues that, as explained above, are well documented in numerous memoranda, warning letters, and performance reviews. Thus, such things as management's decision to give Mowafy only a 1% raise, not send her to "Green Belt" training, and characterize her work as "blundering," though unpleasant, may all be viewed as flowing naturally from inadequate performance.

Though the Court has chosen to review the conduct of the co-ops and management separately, as Mowafy presented it in her brief, the Court has nevertheless considered whether the sum of the alleged mistreatment from both the co-ops and management adds up to sufficient evidence of a hostile work environment so that Mowafy may survive summary judgment. In the Court's view, when judged against the backdrop of well documented performance issues, the aggregate of the alleged misconduct by the co-ops and management falls well short of the mark. This remains true even when Mowafy's allegations of "other workplace difficulty" – which

31

Mowafy is unable to attribute to a specific actor – are included. (See D.I. 53 at 5-7.) These allegations relate to such things as the loosening of screws on experimental apparatuses, the disappearance of data, the placement of tools in "unknown places," and the contamination of solvents. (D.I. 53 at 5-6.) The Court views these unverified allegations as falling into the category of standard workplace tribulations, and is unable to conclude that they meaningfully contribute to establishing a hostile work environment under Title VII.

In sum, though Plaintiff has presented ample evidence of workplace friction, she has not presented evidence that would allow a reasonable jury to find an unlawful hostile work environment under Title VII.

**IV. CONCLUSION**

For the reasons discussed, the Court will grant Defendant's Motion For Summary Judgement on all counts of Mowafy's Complaint.

An appropriate Order will be entered.